UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DARLENE C. ROBINSON, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 11-0723 (PLF) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | ) ) ) ) | |
| Defendant. | ) ) ) | |

OPINION

Plaintiff Darlene Robinson initiated this action after sustaining an ankle injury while riding a Metrobus operated by defendant Washington Metropolitan Area Transit Authority ("WMATA"). Ms. Robinson alleges that her injury resulted from the negligent driving of WMATA's employee. After a five-day trial in June 2012, the jury returned a verdict in Ms. Robinson's favor. WMATA has filed a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure or, in the alternative, for a new trial pursuant to Rule 59. See FED. R. CIV. P. 50(b)(3), 59(a)(1)(A). Upon careful consideration of the parties' papers, the relevant legal authorities, the evidence and arguments presented at trial, and the entire record in this case, the Court will grant WMATA's motion for judgment and will dismiss as moot WMATA's motion for a new trial.[1]

---

[1] The papers reviewed in connection with the pending motion include: the jury verdict form [Dkt. No. 57]; the Clerk's judgment on the verdict ("Clerk's Judgment") [Dkt. No. 61]; defendant's motion for judgment as a matter of law, or, in the alternative, for a new trial ("Def.'s Mot.") [Dkt. No. 66]; defendant's memorandum in support of its motion ("Def.'s Mem.") [Dkt. No. 66]; plaintiff's opposition to defendant's motion ("Pl.'s Opp.") [Dkt. No. 69];

I.  BACKGROUND

Plaintiff Darlene Robinson testified at trial on her own behalf.  She also called two expert witnesses to testify: Dr. Carl Berkowitz, a civil engineer specializing in public transportation safety engineering; and Dr. Jamie Williams, a biomedical and biomechanical engineer.  In addition, Ms. Robinson called her treating physician, Dr. Andrew Siekanowicz; her sister, Shirleta Robinson Tyson; and her former co-worker, Karla Allen.

Defendant WMATA called as a witness Ronald Bumpass, the bus driver who was operating the bus on the morning of the incident.  It also called two expert witnesses: Edward Harris, Service Director for Bus Transportation at WMATA; and Dr. Jeffrey Abend, an orthopedic surgeon.

Ms. Robinson testified that on the morning of April 16, 2008, she boarded the E2 WMATA bus at the intersection of Gallatin and 11th Streets, N.E., near her home in northeast Washington, D.C.  June 6 PM Trial Tr. 31; see also June 7 AM Trial Tr. 8 (parties' stipulation).  A 44-year-old economic analyst, Ms. Robinson was in good health and did not need any assistance to board the bus.  June 6 PM Trial Tr. 28, 57-58.  She swiped her SmarTrip card and greeted the bus driver, Ronald Bumpass.  Id. at 31-32; see also June 7 AM Trial Tr. 8.

According to Ms. Robinson, she then proceeded down the center aisle of the bus while holding on to the handrails, passing several available seats.  June 6 PM Trial Tr. 31-33, 68-70.  While Ms. Robinson was walking down the aisle, Mr. Bumpass pulled the bus away from the bus stop.  June 6 PM Trial Tr. 34.  Mr. Bumpass acknowledged that he did not glance in his internal center mirror to check on the passengers before doing so, nor did he verbally alert the

---

defendant's reply [Dkt. No. 71]; and transcripts of the trial, designated by way of example as "June 5 AM Trial Tr.".

passengers that he was releasing the brakes and proceeding forward. June 7 AM Trial Tr. 49-50, 82-83; <u>see</u> <u>also</u> June 7 AM Trial Tr. 9 (parties' stipulation).

Ms. Robinson testified that shortly after Mr. Bumpass pulled away from the bus stop, and while Ms. Robinson was still walking down the center aisle, he slammed on the brakes but did not come to a complete stop. June 6 PM Trial Tr. 34, 60-62; <u>see</u> <u>also</u> June 7 AM Trial Tr. 49-51, 75-76 (testimony of Ronald Bumpass). According to Ms. Robinson, this deceleration caused her to lose her balance, fall and injure her left ankle. June 6 PM Trial Tr. 35, 66-67.

Another passenger on the bus alerted Mr. Bumpass that Ms. Robinson had fallen down. June 6 PM Trial Tr. 35-36 (testimony of Darlene Robinson); June 7 AM Trial Tr. 51 (testimony of Ronald Bumpass). Mr. Bumpass pulled over to the side of the street, stopped the bus, and went back to check on Ms. Robinson. June 6 PM Trial Tr. 36. Mr. Bumpass offered to take Ms. Robinson to the Fort Totten Metrorail station, but Ms. Robinson declined, explaining that she preferred to return to her house. <u>Id</u>. Mr. Bumpass helped Ms. Robinson off the bus, and she hobbled home. <u>Id</u>. at 36-37. Ms. Robinson alleges that Mr. Bumpass operated the bus in a negligent and unsafe manner, and that she was injured as a direct result of this negligence.

In addition to providing her own account of the incident at trial, Ms. Robinson's sister and former co-worker testified as to the authenticity and severity of her injury, as did Dr. Siekanowicz. Dr. Carl Berkowitz testified as an expert witness that the driver violated several national standards of care that morning, and Dr. Jamie Williams testified as an expert that Ms. Robinson's injury was caused by Ms. Robinson's loss of grip on the handrail and a lack of friction between her foot and the floor.

WMATA moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure at the close of plaintiff's case and again at the conclusion of the

3

evidence. See June 7 AM Trial Tr. 10-34; June 7 PM Trial Tr. 32. The Court reserved ruling on these motions and submitted the case to the jury in accordance with Rule 50(b). See June 7 AM Trial Tr. 34; June 7 PM Trial Tr. 32. The jury returned a verdict in Ms. Robinson's favor, finding that WMATA's employee, Mr. Bumpass, was negligent in his operation of the E2 bus on April 16, 2008, and that this negligence resulted in Ms. Robinson's injury. See Jury Verdict Form. The jury awarded Ms. Robinson $371,379.68 in compensatory damages and $33,333.60 in lost wages. Id.; Clerk's Judgment.

In its motion for judgment as a matter of law or, in the alternative, for a new trial, WMATA asserts that the expert testimony provided by plaintiff's experts was irrelevant and of no assistance to the jury, as well as lacking in foundation sufficient to support their expert opinions. It argues that the testimony of Dr. Williams and Dr. Berkowitz therefore should be stricken. WMATA contends that without this expert testimony, Ms. Robinson has failed to prove a *prima facie* case of negligence. In the alternative, WMATA asserts that two alleged incidents of juror misconduct warrant a new trial.

## II. DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

The Court may grant a motion for judgment as a matter of law under Rule 50 only if it finds that "a reasonable jury would not have had a legally sufficient evidentiary basis to find for the [non-moving] party on that issue[.]" FED. R. CIV. P. 50(a)(1). "In making that determination, a court may not assess the credibility of witnesses or weigh the evidence." United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 735 (D.C. Cir. 1998) (quoting Hayman v. Nat'l Acad. of Sciences, 23 F.3d 535, 537 (D.C. Cir. 1994)); see also Lloyd v. Ashcroft, 208 F. Supp. 2d 8, 10 (D.D.C. 2002). Moreover, the Court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. See

4

Hendry v. Pelland, 73 F.3d 397, 400 (D.C. Cir. 1996); McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000) ("Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in [the non-moving party's] favor.") (internal quotation marks and citation omitted); Pitt v. Dist. of Columbia, 404 F. Supp. 2d 351, 353-54 (D.D.C. 2005), aff'd in part and rev'd in part on other grounds, 491 F.3d 494 (D.C. Cir. 2007) (same). That is not to say, however, that a mere scintilla of evidence will defeat a Rule 50 motion. "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party." 9B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2524 at 250-57 (3d ed. 2008).

Under District of Columbia law, the plaintiff in a negligence action bears the burden of establishing three elements: "an applicable standard of care, a deviation from that standard by the defendant, and injury resulting from that deviation." Scott v. Dist. of Columbia, 101 F.3d 748, 757 (D.C. Cir. 1996); see also Varner v. Dist. of Columbia, 891 A.2d 260, 265 (D.C. 2006); Allison v. Howard Univ., 209 F. Supp. 2d 55, 61-62 (D.D.C. 2002) (citing Hill v. Metro. African Methodist Episcopal Church, 779 A.2d 906, 908 (D.C. 2001)).

  A. *Plaintiff Failed to Establish a Standard of Care through Expert Testimony*

A plaintiff must introduce expert testimony to establish the applicable standard of care that is alleged to have been violated, unless the applicable standard is "within the realm of common knowledge and everyday experience," Hill v. Metro. African Methodist Episcopal Church, 779 A.2d at 908, or within "the ken of the average layperson." Briggs v. WMATA, 481 F.3d 839, 845 (D.C. Cir. 2007) (internal quotation omitted). This exception is recognized,

5

however, "only in cases in which everyday experience makes it clear that jurors could not reasonably disagree over the care required." Id. at 845 (quoting Dist. of Columbia v. Arnold & Porter, 756 A.2d 427, 433-34 (D.C. 2000)). Thus, where a plaintiff seeks to establish standards regarding the specific procedures that public transit bus operators should follow – as in this case – a plaintiff must present expert testimony, as the standards governing the operation of city buses are distinctly related to an occupation that is "beyond the ken of the average layperson." Id. (internal quotation omitted); see also Robinson v. WMATA, 858 F. Supp. 2d 33, 39 (D.D.C. 2012). Furthermore, the applicable standard of care in this sort of case is a national standard of care. Id. at 846-47 (applying national standard of care in negligence suit against WMATA); see also Dist. of Columbia v. Arnold & Porter, 756 A.2d at 433-34 (applying national standard of care with respect to District's alleged negligence in rupture of water main pipe); Clark v. Dist. of Columbia, 708 A.2d 632, 635 (D.C. 1997) (applying national standard of care when considering District's duty to juvenile in its custody). "If at the close of the plaintiff's case, the plaintiff fails to present sufficient evidence to establish the applicable standard of care, the trial court must direct a verdict for the defendant." Toy v. Dist. of Columbia, 549 A.2d 1, 6 (D.C. 1998) (internal citations omitted).

To establish a standard of care through expert testimony, the plaintiff's expert is required to "identify a 'concrete [national] standard upon which a finding of negligence could be based.'" Robinson v. WMATA, 858 F. Supp. 2d at 39 (quoting Dist. of Columbia v. Carmichael, 577 A.2d 312, 315 (D.C. 1990) (noting expert must proffer "a specific, articulable (and articulated) standard of care")). The expert must "clearly relate the standard of care to the practices in fact followed by other comparable governmental facilities or to some standard nationally recognized by such units." Id. (quoting Clark v. Dist. of Columbia, 708 A.2d at 635);

6

see also Evans-Reid v. Dist. of Columbia, 930 A.2d 930, 935-36 (D.C. 2007). "Neither personal opinions nor unsupported generalizations provide a permissible basis for the expert's articulation of the applicable standard of care." Liser v. Smith, 254 F. Supp. 2d 89, 103 (D.D.C. 2003); see also Varner v. Dist. of Columbia, 891 A.2d at 268-69. Nor is expert testimony sufficient "if it consists merely of the expert's opinion of what he or she would do under similar circumstances." Clark v. Dist. of Columbia, 708 A.2d at 635. "The failure to prove a standard of care is fatal because, in order to recover damages for negligence, 'the plaintiff must prove that the defendant deviated from the applicable standard of care.'" Dist. of Columbia v. Carmichael, 577 A.2d at 314 (quoting Toy v. Dist. of Columbia, 549 A.2d at 6).

Violations of procedures prescribed by an agency's internal manual also are insufficient in themselves to establish the standard of care, as "a defendant cannot be held liable for aspiring to efforts beyond an applicable national standard." Varner v. Dist. of Columbia, 891 A.2d at 269-70 (citing Clark v. Dist. of Columbia, 708 A.2d at 636-637); see also Robinson v. WMATA, 858 F. Supp. 2d at 40 ("[T]he [plaintiff's standard operating procedures], without more, are insufficient to establish a national standard of care."). While a plaintiff's expert may point to rules or guidelines set forth in a defendant's own guidebook or its standard operating procedures as evidence of the standard of care, the expert must adequately demonstrate that those rules or guidelines reflect or embody a national standard of care. Clark v. Dist. of Columbia, 708 A.2d at 636; see also Robinson v. WMATA, 858 F. Supp. 2d at 40 n.5; Varner v. Dist. of Columbia, 891 A.2d at 270. "'To hold otherwise would create the perverse incentive for [a defendant agency] to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions.'"

7

Briggs v. WMATA, 481 F.3d at 848 (quoting Dist. of Columbia v. Arnold & Porter, 756 A.2d at 435).

To establish that Mr. Bumpass operated the bus in a negligent fashion, Ms. Robinson proffered the expert testimony of Dr. Carl Berkowitz, who testified regarding the national standard of care applicable to bus drivers in major metropolitan areas. See June 5 PM Trial Tr. at 30-34.[2] The Court found that Dr. Berkowitz, who holds a Ph.D. in Transportation Planning and Engineering and has over thirty years of experience as a public transportation engineer, was qualified as an expert in public transportation safety engineering. Id. at 34-35. Citing WMATA's Standard Operating Procedures ("SOPs"), WMATA rules and regulations, and relevant WMATA training modules, Dr. Berkowitz identified three areas where Mr. Bumpass, the driver, allegedly had breached the national standard of care: (1) the driver's failure to look in the interior center mirror to confirm that passengers were secure and prepared for vehicle movement before releasing the brakes; (2) his failure to announce his intention to proceed before pulling away from the bus stop; and (3) his failure to start the bus gradually and stop smoothly. See June 6 AM Trial Tr. 11.[3] These three standards are discussed in turn.

---

[2] Plaintiff notes that WMATA raised substantially the same objections to Dr. Berkowitz's expert testimony in its motion for summary judgment that it does here and that Judge Huvelle rejected those objections. In denying WMATA's motion for summary judgment, however, Judge Huvelle found only that Dr. Berkowitz, in his expert report, had "put forward a colorable basis to believe" that his testimony at trial could satisfy the standards required for expert testimony. Robinson v. WMATA, 858 F. Supp. 2d at 41. The Court's decision here, by contrast, is based on the evidence actually presented to the jury at trial.

[3] In addition, Dr. Berkowitz asserted that Mr. Bumpass violated a standard of care by failing to carry the WMATA standards on his person or in the bus while operating the Metrobus. See, e.g., June 5 PM Trial Tr. at 102. Even if this was a breach of his duty of care, however, Ms. Robinson does not – and could not – contend that this breach was a proximate cause of her injury.

First, Dr. Berkowitz testified that a bus driver has a duty to check the interior center mirror to ensure that all passengers are secure before pulling the bus away from the stop. June 6 AM Trial Tr. 26-27, 31-32; June 5 PM Trial Tr. 72-75, 88-95, 104. He based this conclusion on WMATA's SOPs, which instruct drivers to "check that the passengers are secure and prepared for bus movement" before "releas[ing] the brakes." June 5 PM Trial Tr. 89, 94; see also Pl.'s Ex. 61 (WMATA SOP Regarding Service Stop); Pl.'s Ex. 63 (WMATA SOPs Regarding Starting & Stopping); Pl.'s Ex. 64 (WMATA SOPs Regarding Accessible Bus Features); Pl.'s Ex. 56 (WMATA Accidents Training Module) (directing drivers to "mak[e] frequent observations"); Pl.'s Ex. 58 (WMATA Bus Driver Instructions: Leaving a Stop). This guidance was confirmed by Edward Harris, WMATA's Service Director for Bus Transportation, who testified that under WMATA's SOPs, a driver should make sure that a passenger is in a secure position – either seated or able to hold on to a handrail – before leaving a bus stop. June 7 PM Trial Tr. 19-20. Mr. Harris noted that this often will involve checking the mirror and looking at the passengers when they board the bus. June 7 PM Trial Tr. 22.[4]

Dr. Berkowitz did not, however, point to any other transit authority that instructs bus drivers to use the internal mirrors to check the status of their passengers before releasing the brakes. Nor did he cite any authority to support his conclusion that this instruction represents a national standard that is generally followed by experienced bus operators, rather than an aspirational practice. Instead, Dr. Berkowitz relied exclusively on WMATA's own SOPs. Such

---

[4] Dr. Berkowitz further testified that the driver has a duty to make sure that all passengers are seated before the bus proceeds, see June 5 PM Trial Tr. 74-76, but the Court instructed the jury to disregard this testimony, id. at 80-81, as foreclosed by Judge Huvelle's May 1, 2012 Opinion and Order. See Robinson v. WMATA, 858 F. Supp. 2d at 36-37 (holding that WMATA's policy that a bus may be operated while passengers are standing is subject to sovereign immunity, making WMATA immune from suit on this theory).

9

reliance is insufficient to establish a national standard of care.  See Varner v. Dist. of Columbia, 891 A.2d at 269-70; Clark v. Dist. of Columbia, 708 A.2d at 636-637.[5]

Second, Dr. Berkowitz stated that the bus operator should make an announcement to passengers when he intends to release the brakes and proceed forward.  June 6 AM Trial Tr. 67, 71, 105.  He conceded, however, that this policy is not included in WMATA's rules and regulations or in its SOPs.  Id. at 68-69, 71.  In addition, he failed to identify any other large transit agency or bus company that has or had a policy of making such announcements, although he stated that "a lot of bus companies do do that."  Id. at 71.

Third, Dr. Berkowitz stated that the driver should start and stop gradually and operate the bus in a smooth manner, again citing WMATA's SOPs.  June 5 PM Trial Tr. 80-81, 91-94, 105; see also Pl.'s Ex. 62 (WMATA SOPs Regarding Onboard Bus); Pl.'s Ex. 63.  Again, he did not reference the standards or policies of any other major transit agency.  Nor did he explain why the directions in the SOPs should be regarded as establishing a national standard of care for negligence purposes, rather than as aspirational guidance.

Despite the requirement under District of Columbia law that an expert must "clearly relate the standard of care to the practices in fact generally followed by other comparable governmental facilities or to some standard nationally recognized by such units," Clark v. Dist. of Columbia, 708 A.2d at 635, Dr. Berkowitz failed to show that the guidance he identified in WMATA's SOPs, rules and regulations, and training modules reflected a national standard of care.  Instead, he simply explained that "in the area of transit, we've come to a lot of consensuses.  And as a result of these consensuses of what should be a safe operation, we have

---

[5] Even if this standard were accepted, Ms. Robinson did not introduce any evidence supporting a causal connection between the driver's failure to check the internal center mirror and her injury.  Had Mr. Bumpass checked his mirror before pulling away from the stop, he presumably would have seen Ms. Robinson with her hand on the handrail, and he therefore would have proceeded to release the brakes, just as he did on the morning of the incident.

10

these standards of care, which have been basically adopted in similar forms in all of the major cities[.]" June 5 PM Trial Tr. 38.  Dr. Berkowitz did not cite actual examples of other metropolitan transit agencies that adhere to the policies and practices he characterized as standards.  Rather, he asserted that because national research on transportation safety issues "filters down" to the major transit agencies, WMATA's policies reflect a national standard of care.  See id. at 36-37.  As Dr. Berkowitz put it:

> Well, it all emanates from the National Academy of Science and the U.S. Department of Transportation.  They basically fund the research in this area.  These research projects are staffed by mostly consulting firms and universities, and this information is then supervised by committees of the American Public Transit Association, the Transportation Research Board.
>
> And what they do is they address issues of safety that are important to the transit agencies in the United States.  And the output of these studies are then presented to the different committees at the American Public Transit Association.  Most of these studies come under a heading that they call TCRP.  It's Transit, Transit Research – Transit Cooperative Research Program.
>
> And they do reports, censuses, analysis, they sponsor programs to visit various transit agencies.  Like transit agencies on the East Coast may go, as part of their program, go look at operations in the West Coast.  Some of the programs, which I never get invited to, are to Europe and Asia . . .  But they do extensive research on all safety issues, not only in the United States, but around the world because there is a lot to be learned.
>
> And this information is then gathered up by organizations like the U.S. Department of Transportation and the American Public Transit Association, which are all partners in this research with the National Academy of Science.  This information then filters down to the various organizations.  And on these committees are, some of the committees I'm on, all the major transit agencies are members and we share the information.  And one thing to keep in mind in terms of standards, standards, when we develop them, are a consensus.

\* \* \*

11

>You pick any major city, including Washington, D.C., any major city, and you'll find they all have the same [or] similar standards of care, the same [or] similar training programs, the same [or] similar rules and regulations, the same [or] similar standard operating procedures. The same standard requirements for training, the same standards for hiring personnel. It is not by accident.

Id. at 36-38.

Such testimony is insufficient to establish a national standard of care or to show that WMATA's policies reflect such a national standard. See Briggs v. WMATA, 481 F.3d at 847 ("[A]n expert must do more than simply state that a purported standard sets a national norm."). "Other than his own personal opinion," and vague references to these organizations' reports and "consensuses" that have developed, Dr. Berkowitz "was unable to suggest any recognized [national] standard" to support his opinion. Varner v. Dist. of Columbia, 891 A.2d at 268. Even when viewed in the light most favorable to plaintiff, the Court must conclude that Dr. Berkowitz's testimony "failed to establish any standard of care, and therefore failed to show how [WMATA] deviated from the standard of care." Dist. of Columbia v. Moreno, 647 A.2d 396, 399 (D.C. 1994).

Equally problematic was Dr. Berkowitz's failure to distinguish SOPs that set forth aspirational standards and practices from requirements that reflect a standard of care for purposes of negligence liability. He testified that WMATA, in drafting its SOPs and other guidance, "did an excellent job. They're probably, you know, they're up in the top tier of quality work that has been done. Their standard of care, their rules and regulations, their standard operating procedures and all their manuals are first class." June 5 PM Trial Tr. 53-54. He then testified that WMATA's guidance was "consistent" with the national standard of care, without addressing the ways in which WMATA's "top tier" guidance might, in fact, *exceed* the applicable national standard. See id. at 54.

The trouble with equating WMATA's guidance with a national standard was illustrated by Dr. Berkowitz's assertion, based on WMATA training modules and SOPs, that there is a national standard of care that requires a bus driver to "start gradually and stop smoothly." See, e.g., June 5 PM Trial Tr. 63-70, 94-95, 105 (discussing Pl.'s Exs. 53-55, 63). Not only did he fail to support this opinion with any facts, but to recognize such guidance as the standard of care for bus drivers in negligence actions against common carriers would be inconsistent with District of Columbia law. As the District of Columbia Court of Appeals has repeatedly observed, "jerks and jars which are no more than the necessary or usual incidents of the operation of such conveyances do not make a carrier liable." Wiggins v. Capital Transit Co., 122 A.2d 117, 118 (D.C. 1956); accord Fells v. WMATA, 357 A.2d 395, 395-96 (D.C. 1976) ("[T]estimony of a sudden stop and resulting injuries does not, by itself, raise a permissible inference of negligence."); see also Johnson v. WMATA, 946 F.2d 127, 1991 WL 214174, at *2 (D.C. Cir. 1991) (unpublished table disposition) ("Because 'jerks' occur often in the normal operation of a bus, evidence of a jerk that resulted in injury is not usually enough for a jury to infer negligence."); Urquhart v. New York City Transit Auth., 85 N.Y. 2d 828, 829-30 (N.Y. 1995) ("To establish a prima facie case of negligence [under New York law] against a common carrier for injuries sustained by a passenger when the vehicle comes to a halt, the plaintiff must establish that the stop caused a jerk or lurch that was 'unusual and violent.'").

In sum, Dr. Berkowitz failed to link or relate the purported standards – checking the internal center mirror before releasing the brakes, making an announcement before pulling away from the bus stop, and failing to start the bus gradually and stop smoothly – to national standards of care. As a consequence, Ms. Robinson has failed to establish specific standards of care through expert testimony. See Clark v. Dist. of Columbia, 708 A.2d at 635; Dist. of

13

Columbia v. Toy, 549 A.2d at 7-8.[6] And if no standard of care is established, there can be no liability for negligence which requires proof that the defendant deviated from the applicable standard of care. See Briggs v. WMATA, 481 F.3d at 848; Dist. of Columbia v. Carmichael, 577 A.2d at 314.

  B. *Plaintiff Failed to Introduce Sufficient Evidence of Unusual or Extraordinary Force*

    The next question is whether Ms. Robinson has established the elements of her negligence claim even without the testimony of Dr. Berkowitz.

    To prove negligence by a common carrier, such as the operator of a public bus, a plaintiff may attempt to show that a bus driver caused a sudden stop or start that was "of such unusual and extraordinary force that it could not reasonably be said to have happened in the ordinary operation of the vehicle." Boyko v. WMATA, 468 A.2d 582, 583-84 (D.C. 1983) (quoting Wiggins v. Capital Transit Co., 122 A.2d at 118). If a plaintiff pursues damages under this theory of liability, she need not introduce expert testimony regarding the standard of care. See, e.g., Brighthaupt v. WMATA, 172 F.3d 918, 1998 WL 794814, at *1 (D.C. Cir. 1998) (unpublished table disposition) (upholding judgment for plaintiff even though plaintiff had offered no expert testimony on national standard of care, where plaintiff, another passenger, and plaintiff's treating physician testified as to violence of bus's movement and resulting injuries that required five surgeries).

    At trial, Ms. Robinson testified as to the nature of the bus's movements. She stated that she rode WMATA buses "practically [her] entire life," June 6 PM Trial Tr. 31, and that the driver on the day of the incident pulled the bus away "faster than normal buses." Id. at

---

[6] Because no standard of care has been established through Dr. Berkowitz's testimony – an essential element that must be proved to establish negligence – WMATA's request to strike Dr. Berkowitz's testimony from the record in its entirety, see Def.'s Mot. at 1; Def.'s Mem. at 12-17, need not be decided.

14

34-35. She described the bus's movements as "abrupt" and "jerking." Id. at 49. Ms. Robinson stated that she saw the trees in an adjacent park "going by swiftly," id. at 34, and that the "bus was moving at a fast pace and all of a sudden it slammed on those brakes," but did not come to a complete stop. Id. at 50. She testified that "[her] right hand swung off of the handle." Id. at 33. She later described her hand as being "yanked off the handrail," when the bus decelerated. Id. at 71. Ms. Robinson argues that this testimony, in combination with that of Dr. Jamie Williams, was sufficient to establish negligence even in the absence of Dr. Berkowitz's testimony. She relies primarily on Boyko v. WMATA for this argument.

  Ms. Robinson's testimony, in and of itself, does not give rise to an inference that the deceleration was "of such unusual and extraordinary force that it could not reasonably be said to have happened in the ordinary operation of the vehicle." Boyko v. WMATA, 468 A.2d at 584. Although Ms. Robinson described the acceleration as "faster than normal" and testified that Mr. Bumpass "slammed on the brakes" a few seconds after he pulled away from the bus stop, this testimony is not inconsistent with the normal operation of a city bus during rush hour. Nor is Ms. Robinson's testimony that her right hand "swung off of the handle" or was "yanked off the handrail" particularly helpful, as she put forth no evidence that she was holding the handrail tightly. Rather, she testified that she was proceeding down the center aisle at the time, see June 6 PM Trial Tr. 31-33, presumably gripping then releasing the vertical bars attached to the back of each forward-facing seat as she progressed toward the middle of the bus. Thus, Ms. Robinson's own testimony is fully consistent "with proper operation of the bus." See Boyko v. WMATA, 468 A.2d at 583-84 (collecting cases where testimony of jerks, lurches, and sudden stops "did not show that the operation of the bus was in any way unusual or extraordinary") (quoting WMATA v. Jones, 443 A.2d 45, 50 (D.C. 1982)).

15

Ms. Robinson supplements her own testimony with that of Dr. Jamie Williams, an expert in biomedical and biomechanical engineering who testified regarding the nature of Ms. Robinson's injury. At trial, Dr. Williams relied on medical testimony that Ms. Robinson sustained a Weber C spiral fracture to her fibula that resulted from "twisting forces or torsional force." See June 5 AM Trial Tr. 58. Dr. Williams opined that Ms. Robinson's injury did not "come from her pure motion moving to the back of the bus or the bus motion itself," but rather indicates that she must have been holding on to something, and then was destabilized. Id. at 61. According to Dr. Williams, the bus's movement caused Ms. Robinson to lose her grip, which "generated the torsional forces on her body necessary to cause this fibula fracture." Id. at 67; see also id. at 61. Dr. Williams also noted that had Ms. Robinson been gripping the handrail tightly and standing with her feet firmly planted on the bus floor, it would have taken ".38 G forces," which presumably is substantial, to cause Ms. Robinson to lose her grip and fall and injure herself in such a manner. June 5 AM Trial Tr. 61-62, 68.[7] But Dr. Williams also conceded that there was no evidence that Ms. Robinson was in fact holding the handrail tightly. See id. at 81-82.[8]

Ms. Robinson contends that her case resembles Boyko v. WMATA, in which the District of Columbia Court of Appeals found that a plaintiff's testimony of a violent "sudden start" of a public bus, supplemented by a physician's testimony regarding the nature of her injury, constituted sufficient evidence to send a negligence claim to the jury, even without expert

---

[7] G-forces provides a unit of acceleration and deceleration. Dr. Williams did not explain the practical significance of a measurement of ".38 G forces."

[8] The Court denies WMATA's request that that Dr. Williams' testimony be stricken or disregarded. See Def.'s Mot. at 1; Def.'s Mem. at 12-17. Although certain portions of Dr. Williams' testimony focused on the implications of hypothetical facts not established at trial, the Court finds that this weaknesses in her testimony goes to the weight of the evidence and her credibility, and does not merit its exclusion entirely.

testimony establishing the standard of care. In <u>Boyko</u>, however, the plaintiff supplied much weightier evidence of the driver's negligence. In addition to describing the bus ride in more dramatic terms – calling the start "violent," "abrupt," and unlike what she had come to expect in her fifty years of experience riding buses – Ms. Boyko presented testimony from her orthopedic surgeon, who stated that her injury was of the sort that "takes a considerable amount of violence." <u>Boyko v. WMATA</u>, 468 A.2d at 583. Ms. Boyko also presented evidence that the driver saw that she was unable to hold the bus handrail, that she boarded the bus during a severe rainstorm, and that the bus driver knew that the floor of the bus was wet and slippery. <u>Id</u>. Given these facts, the court of appeals concluded that there was enough evidence for the case to go to the jury, stating that the evidence was sufficient to show that there was a sudden start of "such unusual and extraordinary force that it could not be said to have happened in the ordinary operation of the vehicle." <u>Id</u>. at 583-84; <u>cf.</u> <u>Fells v. WMATA</u>, 357 A.2d at 395-96 (noting testimony of "'strong' stopping force" and evidence of plaintiff's injury were insufficient to raise inference of negligence).

The evidence here falls short of that in <u>Boyko</u>.[9] While the medical doctor in <u>Boyko</u> testified that the injury plaintiff sustained must have resulted from significant force and "a considerable amount of violence," <u>Boyko v. WMATA</u>, 468 A.2d at 583, Dr. Williams, who is

---

[9] Ms. Robinson also urges the Court to analogize the present facts to those presented in <u>Brighthaupt v. WMATA</u>, 1998 WL 794814, in which the D.C. Circuit upheld this Court's denial of WMATA's motion for judgment as a matter of law. <u>See</u> Pl.'s Opp. at 24. In that case, however, the violence of the bus's movement was established through persuasive testimony by plaintiff, another passenger, and plaintiff's treating physician, who testified about the five operations plaintiff required. <u>See</u> <u>Brighthaupt v. WMATA</u>, 1998 WL 794814, at *1-2. And although the court in that case took into account evidence that the bus operator had violated a WMATA policy, without the benefit of expert testimony establishing that this requirement reflected a national standard of care, the court cited case law noting that the particular WMATA policy at issue was mandated under federal law. <u>See id.</u> (citing <u>Harvey v. WMATA</u>, 814 F.2d 764, 768 n.5 (D.C. Cir. 1987)).

not a medical doctor, only suggested in her testimony here that it was *possible* that Ms. Robinson's injury resulted from significant force; but there was no medical testimony to support that supposition. Such testimony is not persuasive in the absence of corroborating testimony about the nature of the fall or the force that was created. See Johnson v. WMATA, 1991 WL 214174, at *2 (finding physician's testimony insufficient where that testimony showed that plaintiff's injury was not inconsistent with the normal operation of a bus). Furthermore, Ms. Robinson failed to provide any other evidence that corroborates her argument – raised primarily through counsel in his briefs, rather than through testimony at trial – that the deceleration was unusual or extraordinary. The Court therefore finds that Ms. Robinson did not present a legally sufficient evidentiary basis to support the jury's verdict in her favor in the absence of expert testimony on national standards of care.

### III.  DEFENDANT'S MOTION FOR A NEW TRIAL

WMATA moves, in the alternative, for a new trial under Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure, citing possible juror misconduct. See FED. R. CIV. P. 59(a)(1)(A). Because judgment is being awarded to WMATA for the reasons discussed above, the Court need not reach the question of whether a new trial is required. It notes, however, that WMATA has raised legitimate concerns about Juror Number 8's post-trial disclosure that he previously lived near 11th and Gallatin Streets, N.E., and often observed drivers failing to stop at the stop sign at that intersection, facts that he failed to advise the Court and counsel of during *voir dire* in response to questions that should have elicited this information.[10]

---

[10]  WMATA also contends that Juror Number 7's admission that she performed her own speed calculations during deliberation amounts to juror misconduct. Because a court generally will not examine a juror's internal deliberations, however, the Court concludes that this alleged misconduct would not merit a new trial.

Case 1:11-cv-00723-PLF   Document 79   Filed 04/23/13   Page 19 of 20

"The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias." United States v. Boney, 977 F.2d 623, 633 (D.C. 1992) (citing McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984)). The juror's belated disclosure of his familiarity with the scene of the incident could warrant a new trial if it were shown that his knowledge resulted in bias or prejudgment of the facts that went undetected during *voir dire*. See McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. at 554 ("*Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors."); but see United States v. Morrow, 412 F. Supp. 2d 146, 170-72 (D.D.C. 2006) (declining to order new trial after jurors disclosed that they were familiar with crime scene, because nondisclosure did not affect fairness of trial). An evidentiary hearing therefore would be necessary to determine the reasons for the juror's failure to disclose this information during *voir dire*, whether he discussed the facts he failed to disclose with his fellow jurors, and whether any prejudice occurred as a result. See United States v. Boney, 977 F.2d at 634 (explaining that remedy for alleged juror misconduct is a hearing to determine whether prejudice occurred); United States v. White, 116 F.3d 903, 929 (D.C. Cir. 1997) (noting that a hearing is ordinarily required when there is evidence that a juror lied during *voir dire*). Because judgment is entered in favor of defendant WMATA, however, both the need for such a hearing and WMATA's motion for a new trial are moot.

19

## IV. CONCLUSION

For the reasons set forth above, the Court finds that plaintiff Darlene Robinson failed to provide a legally sufficient evidentiary basis for a reasonable jury to find in her favor. The Court therefore grants defendant WMATA's motion for judgment as a matter of law. It denies as moot WMATA's motion for a new trial.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

DATE: April 23, 2013

/s/_____
PAUL L. FRIEDMAN
United States District Judge